MILLS, Judge.
The adoptive parents of the four children involved herein appeal from a final order of the trial court adjudging that the children should be permanently committed for adoption pursuant to Section 39.41(l)(f), Florida Statutes (1985). We affirm.
In February 1984, the adoptive father was arrested in Jacksonville, Florida, and *1119 charged with sexual abuse of the children. He was subsequently indicted and charged with sixteen counts of sexual misconduct. Although he was acquitted by a jury in August 1984, prior thereto, in April 1984, the Department of Health and Rehabilitative Services (HRS) filed petitions with the trial court to have the children declared dependent within Chapter 39, Florida Statutes. The children were adjudged dependent and, following a disposition hearing, were ordered placed with HRS for foster home placement. The adjudication and placement were affirmed by this court without opinion. See In Interest of J.N., 479 So.2d 120 (Fla. 1st DCA 1985).
After the children were placed out of the home, on 17 October 1984, the parents entered into a “performance agreement” with HRS pursuant to Section 409.168(3), Florida Statutes. The purpose of such an agreement is to record “the actions to be taken by the parties involved in order to quickly assure the safe return of the child to his parents or, if this is not possible, the permanent commitment of the child to the department or licensed child-placing agency for the purpose of finding a permanent adoptive home.” Section 409.168(3)(a). The stated legislative intent of this requirement is the achievement of permanent placements of foster care children with their former or new adoptive families as soon as possible, and that no child remain in foster care for more than one year. Section 409.168(l)(b).
The performance agreement entered into by the parents required them to perform four major “tasks” toward the resolution of their “problem,” stated as “[t]he father ... has been alleged to have sexually abused four of his children and/or foster children. The children have been subjected to a detrimental environment in that the mother was neglectful who either knew or reasonably should have known of some of the abuse and misconduct.” Those tasks were: 1) arrange for psychological evaluations, 2) pay for them, 3) follow all recommendations for treatment made by the psychologist, and 4) have no contact, directly or indirectly, with any of the children. The expiration date of the agreement was 30 December 1985.
The initial psychological evaluation was performed by Dr. Krop, a clinical psychologist, in October 1984. During the course of that evaluation, the father denied that any incidents of sexual abuse had occurred, in which denial he was strongly supported by the mother. Dr. Krop therefore concluded that further therapy would be fruitless, since acknowledgement by the offender and the support of the abuse victim by the mother was essential to that therapy. The same conclusion had been reached by Dr. Legum, also a clinical psychologist, who had begun psychological testing of the mother in the spring of 1984. He ceased the testing based on continued denials, believing that no treatment could occur without admission of the incidents by the father and support of the daughter by the mother.
After the parents relocated to Orlando in November 1984, their case was taken over by Dr. Mara, a clinical psychologist, who referred them to Dr. Waxenberg, also a psychologist but not an incest therapist. The parents requested and received referral to Wyre and Landis, marital and family counselors, in whose program they remained from January 1985 until May 1985, receiving some 29 one-hour sessions of “intensive” treatment. Throughout the course thereof, the father maintained his strong denial of any incidents and the mother continued to support him; neither would concede any responsibility for the incidents.
In March 1985, Dr. Mara was requested to perform a “post-psychological follow-up evaluation.” As to both parents, she concluded that further therapy would be useless in that, despite weekly treatments for four months, reports from Waxenberg, Wyre and Landis all indicated continued denial by the father and support by the mother. It was Mara’s opinion that the pattern of denial and support would not change, rendering further treatment of the parents’ problems moot.
*1120 Following this report, on 19 April 1985, six months after commencement of the performance agreement and eight months before its scheduled expiration, HRS filed the instant petitions for permanent commitment, reiterating the abuse charges and alleging substantial failure to comply with the performance agreement. The hearing on the petitions was held over five days in July, September and October, 1985. Drs. Legum, Krop and Mara testified that treatment of the parents as required by the agreement was useless, based on the ineffectiveness of therapy in the face of continued denial by the father and support by the mother. Drs. Krop and Mara opined that, because of that denial, there would be great risk to the children in reuniting the family. This expert testimony was contradicted by Dr. Waxenberg and by Wyre and Landis, who felt that, in a “strictly supervised” environment, the family could be brought together.
The court entered its final order of permanent commitment on 9 December 1985. It found the evidence clear and convincing that there had been no substantial compliance with the agreement, the thrust of which was to require therapy for the father’s abuse and the mother’s neglect. It found that the parents had made no progress toward that goal and that, based on Mara’s report stating that denials persisted and seemed likely to, there was no reasonable likelihood or probability that reunification would ever be safe. Citing the legislative intent to either reunite the family or make other permanent plans as soon as possible and noting that the children had been “in limbo” for 22 months, the court concluded that the time for a stable family life had arrived.
The parents contend first that HRS erred in instituting permanent commitment proceedings before the expiration of the performance agreement, relying on Gerry v. Department of Health and Rehabilitative Services, 476 So.2d 1279 (Fla.1985), and Burk v. Department of Health and Rehabilitative Services, 476 So.2d 1275 (Fla.1985). While Gerry and Burk require HRS to offer a performance agreement before petitioning for permanent commitment of children away from their families, nothing in those cases requires that the agreement expire before permanent commitment can be sought. This is consistent with the stated legislative intent to achieve permanent placement as soon as possible for every child in foster care and that no child remain therein for longer than one year. Section 409.168(l)(b). If, as the circumstances of this case indicate, allowing the child to remain in foster care until the expiration of the agreement would achieve nothing further toward the legislative goal of permanent placement, HRS should be able to seek permanent commitment prior to its expiration.
Further, the performance agreement itself indicates that HRS will seek review of the parents’ compliance before expiration of the agreement. This review is evidently pursuant to the statutory requirement that “the court shall review the status of the child ..., the initial review to be held no later than six months after the child was ordered into foster care.” Section 409.-168(5)(b) and (e)l. Because performance agreements can extend for as long as 18 months, Section 409.168(3)(b), the legislature clearly contemplated that an agreement could be revisited prior to its expiration, with one of the goals of its review the determination by the court of “the compliance or lack of compliance of all parties with each item of the performance agreement _” Section 409.168(5)(g)4.
Although normally a decision to seek permanent commitment is not made until the end of this status review, Section 409.-168(6)(a) states that
[i]f, in preparation for any judicial review hearing pursuant to this section, it is the opinion of the social service agency that the parents ... of the child have not complied with their responsibilities as specified in the written performance agreement, although able to do so, the social service agency shall state its intent to initiate proceedings to terminate parental rights ... (emphasis supplied).
*1121 Therefore, it is apparent that the Legislature intended that HRS be able to initiate permanent commitment proceedings not only prior to the expiration of the agreement but outside of the status reviews provided for in Section 409.168(5)(b). We find no error on this point.
The parents further contend that the trial court had no jurisdiction to enter orders of permanent commitment before expiration of the performance agreement. Again, we disagree. Section 409.168(5)(a)l provides that “the court shall have continuing jurisdiction in proceedings under this section and shall review the status of the child pursuant to this subsection or more frequently if the court deems it necessary or desirable.” Coupled with HRS’s ability to seek permanent commitment prior to the expiration of the agreement, we find that this section gives the trial court jurisdiction to consider those petitions.
Section 39.41(l)(f)3(b) does not require a different result, as the parents contend. That statute provides that the court shall have the power, after the expiration of the agreement, to permanently commit the child if it finds that the agreement has not been substantially complied with. It does not state that this is the only circumstance under which the court has that power. In light of Section 39.41(l)(d), providing that “[ajfter the child is committed to the temporary custody of the department, all further proceedings under this section shall additionally be governed by s. 409.-168 ” (emphasis supplied), we find that the trial court had the authority to enter the order complained of.
Finally, the parents allege that there was no competent evidence to support the trial court’s finding that they had failed to comply with the agreement and that they would never be well enough to reunite them with their children. The purpose of a performance agreement is to ensure permanency for children by recording the actions to be taken by the parties involved to quickly assure the safe return of the child to his family or his permanent commitment for the purpose of finding a permanent adoptive home. To this end, the agreement is phrased in terms of problems and tasks to be performed toward the resolution of the problems.
In this case, the problem was stated in terms of the father’s sexual abuse of the children and the mother’s tolerance of that abuse. The agreement required the parents to seek evaluation and treatment which, while this is not explicitly stated, had the obvious goal of resolving the incest and the mother’s acquiescence thereto. While the parents did seek therapy, it was consistently based on the father’s adamant denial of the abuse and the mother’s “100% support” of him in that contention. •
There was ample expert testimony that no incest therapy would be successful without admission of the incidents by the father and the mother’s belief in and support of the victims. There was further expert testimony that the children should not be returned in the face of these denials, which the parents had maintained through four months of intensive therapy and which, in Dr. Mara’s opinion, they would continue to maintain for the foreseeable future. Therefore, we find that there was competent evidence 'to support the conclusions of the trial court that the parents had failed to comply with the performance agreement and that their problems were not going to be solved so as to make it safe for the children to return to the home.
Affirmed.
WIGGINTON and NIMMONS, JJ., concur.